# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| JOSE MALTA, § | |
| § | |
| Plaintiff § | |
| § | |
| v. § | Civil Action No. 3:10-CV-1320-BH |
| § | |
| MICHAEL J. ASTRUE, § | |
| **Commissioner of Social Security,** § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the District Court's order of transfer, dated September 8, 2010, this case has been transferred for all further proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c). Before the Court are *Plaintiff's Motion for Summary Judgment*, filed October 1, 2010, and *Defendant's Motion for Summary Judgment*, filed October 22, 2010. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **DENIED**, Defendants's motion is **GRANTED**, and the decision of the Commissioner is wholly **AFFIRMED**.

## I. BACKGROUND[1]

### A. Procedural History

Plaintiff Jose Malta ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability benefits under Title II of the Social Security Act. On November 7, 2007, Plaintiff applied for disability insurance benefits, alleging disability since March 27, 2007, due to total left and right hip replacements,

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

history of kidney problems, high blood pressure, and cervical disc problems. (R. at 145-47, 162.) His application was denied initially and upon reconsideration. (R. at 80, 85.) He timely requested a hearing before an Administrative Law Judge ("ALJ"), and personally appeared and testified at a hearing held on April 13, 2009. (R. at 88, 35-37.) On October 2, 2009, the ALJ issued a decision finding Plaintiff not disabled. (R. at 25-33.) Plaintiff then requested the Appeals Council to review the ALJ's decision in light of newly submitted evidence. (R. at 7.) On May 28, 2010, the Appeals Council denied his request for review, and the ALJ's decision became the final decision of the Commissioner. (R. at 1-4.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.     Factual History**

   **1.     Age, Education, and Work Experience**

Plaintiff was born on July 11, 1964, was forty-two years old on his alleged onset date, and was forty-five years old at the time of the hearing before the ALJ. (R. at 32, 145.) He has a high school education and past relevant work as a meter reader, warehouse worker, material blocker, sales clerk, and shipping receiving clerk. (R. at 32.)

   **2.     Medical Evidence**

   *a. Evidence Before the ALJ*

Plaintiff's relevant medical begins in March 2007, when Plaintiff started complaining of hip and knee pain accompanied by weakness in his legs. (R. at 325-26.) An evaluation by Jeffrey B. Siegel, M.D., demonstrated bilateral degenerative changes with marginal sclerosis and loss of articular cartilage, but no fracture, dislocation, or bony destruction. (R. at 370.) The following month, Kurt J. Kitziger, M.D., reported that the pain in Plaintiff's left hip was getting worse and that

he had to walk with crutches. (R. at 408.) According to Dr. Kitziger, Plaintiff had a little pain in the right hip but it was not nearly as bad as on the left. (*Id.*) Diagnosing Plaintiff with osteonecrosis of both femoral heads, he recommended left total hip arthroplasty ("THA") and noted a potential need for right THA if Plaintiff developed increasing pain on that side. (*Id.*) Plaintiff agreed to have the left hip replacement surgery in mid-May. (R. at 289.) In the weeks following surgery, Dr. Kitziger reported that Plaintiff had very little pain, was undergoing physical therapy at home, and was able to get up and walk although he relied on crutches for support. (R. at 332, 403, 406.)

In July 2007, Plaintiff complained that his right hip had started to hurt like his left one had before the replacement surgery (R. at 290), but he reported that he was driving his car (R. at 402). Upon physical examination, Dr. Kitziger noted that Plaintiff had a left-sided limp and tenderness in his left hip with a pain-free range of motion. (R. at 402.) He also noted that Plaintiff's right hip had pain on any attempt at rotation and had mottling throughout with cyst formation. (*Id.*) Plaintiff initially decided to delay right THA due to financial concerns (*id.*), but by early October, he had scheduled the surgery for December (R. at 387).

In October, Plaintiff reported to Dr. Kitziger that his left hip was doing well with only occasional tenderness but his right groin had been increasingly painful. (R. at 401.) The pain in his right groin reportedly got worse with weight-bearing, radiated into his buttock and thigh, and was as bad as his left hip before surgery. (*Id.*) Upon physical examination, Plaintiff was noted to have a significant limp on the right side, zero degree of flexion, and twenty degrees of external and zero degrees of internal rotation with pain throughout. (*Id.*) Dr. Kitziger informed Plaintiff that after his right THA, he would be able to perform sedentary work. (*Id.*)

In early December, Plaintiff returned to Dr. Kitziger for an evaluation and informed him that he was considering putting off the right hip replacement surgery. (R. at 436.) He reported that the

pain in his right hip was not as bad as his left hip was before the surgery, his good days still outnumbered the bad, and he could walk up to a mile on a good day. (*Id.*) His right hip pain was typically a five on a ten point scale. (*Id.*) Upon physical examination, Dr. Kitziger noted that Plaintiff's right hip was non-tender with zero out of eighty degrees of flexion and twenty degrees of rotation without any pain. (*Id.*) The X-ray images appeared to show a worsening of the right hip osteonecrosis. (*Id.*) Dr. Kitziger recommended putting off the surgery, however. (*Id.*)

In February of 2008, Plaintiff reported that his right hip pain had worsened (R. at 446), and he was noted to be walking with a limp (R. at 449). In May of 2008, Plaintiff told Dr. Kitziger that he was ready for surgery on his right hip; he reportedly had no pain in his left hip but the pain in his right hip had progressed to an eight on a ten point scale, and he could only walk a block or two at most. (R. at 455.) On physical examination, he arose unassisted but had a very bad limp on the right side and marked pain when attempting rotation at the right hip. (*Id.*)

In May, Dr. Kitziger filled out a detailed physical capacities evaluation, in which he opined that Plaintiff's pain was disabling to the extent that it would prevent him from working full-time at even a sedentary position. (R. at 456-59.) He also opined that the mental effects of his pain constituted a significant handicap to sustained attention and concentration, which would eliminate skilled work tasks. (R. at 459.)

On June 25, 2008, Plaintiff underwent right THA. (R. at 460.) Three weeks after the surgery, Dr. Kitziger, noted that Plaintiff was "getting along well," was "taking the occasional pain pill at night," was bearing full weight in his walker, and had ninety degree of flexion without pain. (R. at 496.) Three months after the surgery, in September 2008, Dr. Kitziger noted that Plaintiff was getting along well, was no longer taking any pain medication, and had ninety degree of pain-free flexion, but he complained of some clicking and pain in his low back region. (R. at 497.) Dr.

Kitziger supplied him with some back and hip stretching exercises. (*Id.*)

### b. *Appeals Council Evidence*

In March of 2009, Plaintiff was seen at Parkland Hospital for pain in his hips and low back. (R. at 528.) Plaintiff reported that he had been experiencing pain since his surgery, but he had not followed up because he had lost his insurance coverage. (*Id.*) The assessment upon physical examination was status post bilateral hip replacement with continued pain. (*Id.*) He was noted to have a mildly antalgic gait, intact sensation and normal motor strength; physical therapy was recommended for strengthening. (R. at 528-29.) The following month, Plaintiff reportedly fell out of a chair, causing pain in his hip area. (R. at 582.) Plaintiff had normal flexion and extension of the left hip with pain on internal rotation, and he reported that Tylenol helped his pain. (*Id.*) X-rays showed that the left hip was grossly stable in appearance with no acute fractures and that the right hip had no post-surgery complications. (R. at 594, 596.)

In February of 2010, Plaintiff returned to Parkland where he was assessed as having chronic pain in his neck and low back . (R. at 557-58.) The following month, Plaintiff reported that he had experienced neck pain before the surgeries but his low back pain had begun after the surgeries. (R. at 536.) He rated the pain as a six out of ten and reported that he was taking Hydrocodone to control it. (*Id.*) The physician's impression was that Plaintiff's neck pain was "related to cervical degenerative disk disease worse at C6-7, with broad-based disk protrusion seen throughout C3-7 with central canal and bilateral foraminal stenosis at C6-7." (R. at 537.) He noted that the low back pain was "related to bilateral facet hypertrophy at L5-S1 with a left lateral disk protrusion, and superior migration contracting the left L5 nerve root." (*Id.*) Two views of the lumbar spine revealed osteoarthritis involving the facet joints of the last two lumbar segments with no subluxation. (*Id.*)

### 3. Hearing Testimony

On April 13, 2009, Plaintiff and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 35-36.) Plaintiff was represented by an attorney. (R. at 35.)

#### *a. Plaintiff's Testimony*

Plaintiff testified that prior to his disability onset date, he had worked full-time as a warehouse associate in shipping and receiving and picking and packing, and he was accustomed to lifting between seventy and ninety pounds. (R. at 41-42.) Prior to that, he had worked as a meter reader, material blocker, clerk, and welder. (R. at 42-43.)

Plaintiff testified that he stopped working due to deterioration of his hips. (R. at 43.) He had a kidney transplant in 1997, and was placed on prednisone therapy due to rejection. (R. at 50.) He underwent a hip replacement on his left hip in May of 2007, but it did not help him. (*Id.*) Presently, his left hip was doing fine but he experienced pain at times. (*Id.*) His right hip was replaced in June of 2008, but it did not help his problem at all. (*Id.*) He had pain on his right hip and lower back that traveled down his thigh and stopped at his knee. (R. at 51.) Plaintiff testified that both his hips were deteriorating at the same time, but since his left hip was worse than his right one, Dr. Kitziger decided to replace his left hip first. (*Id.*) After his left hip replacement, he used a walker for a month, used crutches for a month, and used a cane for a month and a half before being able to walk on his own. (R. at 52-53.) A similar progression followed after his right hip replacement even though it took him four months to walk on his own. (R. at 53.) He did not have any infection after the surgeries and never dislocated either of the hip joints. (*Id.*)

He felt tired because of the pain on the right side of his hip and lower back that traveled down the side and front of his leg. (R. at 57-58.) He felt pain when his lower back popped and when he bent over. (R. at 59.) His doctors recommended physical therapy and a little walking. (R.

at 55.) He was taking hydrocodone for his pain about two to three times a day, depending on the need to drive. (R. at 54.) Plaintiff testified that one of medications gave him gout, Darvocet caused frequent bowel movements, and Prednisone caused urination three to four and maybe six times a night. (R. at 56.) The pain medication made him drowsy so that he had to lay or sit down two to three times a day for about two to three hours each time. (R. at 56, 65-66.)

Presently, he could walk or stand about fifteen minutes before needing to sit down, and he could sit for twenty minutes before having to stand or lie down. (R. at 54.) He could not bend over at the waist to pick a piece of paper, or squat down, kneel or crawl. (R. at 65.) His wife did the household chores. (R. at 66.) His wife and daughter helped him put on socks and shoes and wash his feet. (R. at 66-67.) He did not do any grocery shopping because he could not walk around the store like he used to. (R. at 67.) He used to play with his daughters and family and go to picnics and barbecues etc., but he could not do those things anymore. (R. at 68-69.) He stopped attending church because it required sitting down or kneeling down too long. (R. at 67.) He did not visit any family and friends; they visited him. (R. at 67-68.) He stopped going out to any parties, dances, clubs, or meetings. (R. at 68.) He watched TV all day long while laying down or sitting on his couch. (*Id.*) He also read at times. (R. at 68.) He had driven twenty minutes to get to the hearing. (*Id.*) Plaintiff testified that he did not see Dr. Kitziger after September 2008 because his wife had run out of insurance coverage. (R. at 65.)

### b. *Vocational Expert's Testimony*

The VE testified that Plaintiff had past relevant work as a meter reader, warehouse worker, material blocker, sales clerk, and shipping and receiving clerk. (R. at 70.)

The ALJ asked the VE to opine whether a person with Plaintiff's age, education, and work history could perform Plaintiff's past relevant with the following RFC: lift and carry twenty pounds

occasionally and ten pounds frequently; stand or walk for six out of eight hours; sit for six out of eight hours with two minute breaks every thirty minutes; occasionally climb ramps and stairs; cannot climb ladders, ropes, or scaffolds; cannot balance, stoop, kneel, crouch, or crawl; cannot work at unprotected heights or with hazardous moving machinery, or work at temperature or weather extremes; and has a reasoning level of three, a math level of two, and a language level of two. (R. at 70-71.) The VE responded that such an individual could perform Plaintiff's past relevant work as a sales clerk. (R. at 71.)

When the ALJ modified the RFC to the sedentary level where he could carry and lift a maximum of ten pounds and stand or walk for two out of eight hours, the VE testified that the hypothetical individual could not perform any of Plaintiff's past relevant work. (*Id.*) However, such an individual could perform other work that existed in significant numbers in the economy. (*Id.*) If the individual was restricted to sitting, standing, or walking for a total of two out of eight hours, the individual could not perform full-time competitive work. (R. at 72.)

**C.    ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on October 2, 2009. (R. at 25-33.) She found that Plaintiff had not engaged in substantial gainful activity since March 27, 2007. (R. at 27, ¶ 2.) She also found that Plaintiff had a severe combination of impairments, including a history of kidney transplant with long term use of steroids, chronic renal insufficiency, status post bilateral total joint replacement, and hypertension, but she concluded that these impairments did not meet or medically equal a listed impairment. (R. at 27, ¶¶ 3, 4.) In her residual functional capacity ("RFC") assessment, the ALJ found that Plaintiff had the RFC to lift and carry ten pounds occasionally, stand and walk two hours in an eight-hour workday, sit six hours in an eight-hour workday, stand and/or walk six hours in an eight-hour workday with the opportunity

to change positions for two minutes every thirty minutes, and occasionally climb ramps and stairs. (R. at 28, ¶ 5.) She found, however, that Plaintiff did not maintain the RFC to: climb ladders, ropes and scaffolds; frequently stoop; balance, kneel, crouch, or crawl; work at protected heights or near hazardous moving machinery; or be exposed to extreme temperatures or weather. (*Id.*) With respect to his mental functional capacity, the ALJ found that Plaintiff could not perform his past relevant work, but given his age, education, work experience, and RFC, he could perform other jobs existing in significant numbers in the economy. (R. at 32, ¶¶ 6-10.) She concluded that Plaintiff had not been disabled since the date of his application through the date of her decision. (R. at 33, ¶ 11.)

## II. ANALYSIS

**A.    Legal Standards**

    **1.    Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

2.  **Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.   Issue for Review**

Plaintiff presents the following issues for review:

1. In order for an individual to be considered disabled, they must be unable to engage in substantial gainful activity for a period lasting, or expected to last, not less than twelve months. The ALJ treated Plaintiff's right and left hip replacements as two impairments lacking the durational requirement to be disabling. Did the ALJ create reversible error in failing to find Plaintiff's bilateral hip impairment a singular disabling impairment lasting longer than twelve months?

2. The determination of a claimant's credibility regarding the disabling nature of pain must be supported by substantial evidence. The ALJ cites no evidence or misrepresented evidence in support of her conclusions. Is the ALJ's credibility finding substantially supported?

3. A reviewing court should remand the case if new and material evidence submitted

>to the Appeals Council after the ALJ's decision dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. Plaintiff submitted treating source records to the Appeals Council which supported his allegations and contradicted several of the ALJ's findings. Did the new evidence dilute the record such that the ALJ's findings are not substantially supported?

(Pl. Br. at 1-2.)

C. **Single Impairment**

Plaintiff essentially argues that the ALJ committed prejudicial error when she treated his bilateral hip impairment as two different impairments that singly did not meet the twelve-month duration requirement at the required level of severity. (Pl. Br. at 11-14.)

An individual is considered disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(B). This durational requirement applies to a claimant's impairment as well as his inability to engage in any substantial gainful activity. *Barnhart v. Walton*, 535 U.S. 212, 218-19 (2002); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The Social Security regulations provide that two or more successive and unrelated severe impairments cannot be tacked to meet the durational requirement where neither impairment alone is expected to last at least twelve months. *See* 20 C.F.R. § 404.1522(a); *see also McAdams v. Sec'y of Health & Human Servs.*, 726 F.Supp. 579, 586 n. 3 (D.N.J. 1989); *Romero v. Astrue*, 2009 WL 4693914, at *9 (D. Ariz. Dec. 4, 2009).

Here, the ALJ discussed the regulation and found that Plaintiff's hip conditions were two different impairments that singly did not meet, and could not be combined to meet, the twelve month durational requirement. (R. at 30-31.) Although there is evidence that Plaintiff had significant

osteonecrosis of both femoral heads at his alleged onset of disability, and that Dr. Kitziger had been evaluating and discussing the two hip conditions concurrently in his reports, the conditions were not necessarily related. Dr. Kitziger suggested left hip surgery in May 2007, but identified only a potential need for right hip surgery at the time. Although Plaintiff developed pain in his right hip, he told the doctor that he was considering putting off any surgery because his right hip was not as painful as his left had been, and he had more good days than bad. He later underwent right hip surgery in June 2008, a year after this left hip surgery. The two conditions therefore progressed separately and could reasonably be considered as two separate and unrelated impairments.

Even assuming that the ALJ erred by not considering the two hip conditions as a single impairment to determine if the twelve month durational requirement had been met, Plaintiff has not shown that the error was prejudicial. In Social Security cases, a claimant generally establishes prejudice by showing that absent the error, the ALJ might have reached a different conclusion. *See Newton*, 209 F.3d at 453; *Ripley v. Chater*, 67 F.3d 552, 557 n. 22 (5th Cir. 1995). Here, even if the ALJ had considered the two hip conditions as a single impairment, Plaintiff has not shown that her disability determination would have changed. Even if she found that the single impairment met the twelve-month durational requirement, Plaintiff reported well within the durational period that his good days outnumbered the bad, that he was able to walk up to a mile on a good day, and that even on a bad day, his pain was five on a ten-point scale. When a physical impairment is alleged, even "the mere evidence of symptom free intervals may negate a finding of disability." *Singletary v. Bowen*, 798 F.2d 818, (5th Cir. 1986). Additionally, there is no evidence in the record that Plaintiff suffered disabling pain or could not perform substantial gainful activity in November and December of 2007, and in January of 2008.

Plaintiff argues that had the ALJ considered his bilateral hip impairment as a single impairment, he would likely have met or medically equaled Listing 1.02 or 1.03 relating to major dysfunction or reconstruction of a weight-bearing joint. (Pl. Br. at 13.) "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Listing 1.02 and 1.03 both require the claimant to establish, among other things, that he lacks the ability to ambulate effectively. *See* 20 C.F.R. Pt. 404, Subpt. P. App. 1. Examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, and the inability to carry out routine ambulatory activities, such as shopping and banking. 20 C.F.R. Pt. 4040, Subpt. P., App. 1, § 1.00(B)(2)(b).

Here, the ALJ explicitly found that Plaintiff could ambulate effectively and did not meet the required level of severity for twelve months. (R. at 27-28.) This finding was supported by substantial evidence of record. As discussed, Plaintiff reported well within the twelve-month period that he could walk up to a mile on a good day and that his good days outnumbered his bad. Additionally, there is no evidence that Plaintiff was unable to ambulate effectively in November and December of 2007, and in January of 2008. His inability to ambulate effectively for almost three and a half months after his first surgery, and four months after the second surgery, represent distinct and separate periods which cannot satisfy the statutory requirement of continuous disability for twelve months or more. *See Bowman v. Califano*, 482 F.Supp. 288, 292 (D.C. La. 1980) ("where an impairment causes periods of confinement and recuperation which are less than twelve months in duration, plaintiff may not be considered disabled"); *Schaffer v. Califano*, 433 F.Supp. 1218, 1224

(D.C. Md. 1977) (if the underlying impairment is insufficient to be disabling to a particular claimant, his hospitalizations to correct the underlying impairment and any periods of recuperation represent distinct and separate periods of disability which cannot satisfy the statutory requirement of continuous disability for twelve months or more, even if the underlying impairment will continue to exist most likely for more than the statutory minimum period).

Remand is not required on this issue because Plaintiff has not shown that the ALJ's error, if any, was prejudicial.

**D.** **Credibility**

Plaintiff next argues that the ALJ's statements in support of her credibility determination are not supported by substantial evidence and that her failure to develop the record contributed to her unsupported credibility finding. (Pl. Br. at 14-18.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994). Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).

Here, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with her RFC assessment. (R. at 30.) In support of her finding, the ALJ reasoned that there were inconsistences

in Plaintiff's allegations and there was a "paucity of objective medical evidence;" for example, while Plaintiff alleged the need for a recumbent rest position at the hearing, there was no objective medical evidence to support that allegation. (R. at 30-31.) She also reasoned that Plaintiff's two surgeries were generally successful in relieving his symptoms. (R. at 30.) She pointed out that after his left surgery, Plaintiff reported that he was doing well with only occasional and diminishing minimal tenderness in his left hip when he rolled onto it night, and that Dr. kitziger observed a pain-free range of motion. (R. at 29.) In December 2007, she stated that Plaintiff expressed a desire to delay his right hip surgery, and he reported that his good days still outnumbered his bad days and that he could walk up to a mile on a good day. (R. at 29- 30.) She also pointed out that Plaintiff reported getting along well with no pain on his left side in May 2008. (R. at 30.) As to his condition after the right hip surgery, she stated that three months after the surgery, Plaintiff told Dr. Kitziger that he was doing well, was doing physical therapy at home, and was no longer taking any pain medication. (R. at 30.) She also gave significant weight to Dr. Kitziger's opinion in October 2007 that Plaintiff would be able to perform sedentary work after his right hip surgery. (R. at 31.) She gave little weight to Dr. Kitziger's May 2008 opinion concerning Plaintiff's inability to perform even sedentary work, but reasoned that the opinion was not very specific as to the time period to which it applied, and assumed that it concerned the period beginning May 21, 2008, when Plaintiff had reported increasing pain on his right side. (*Id.*)

The ALJ properly considered the evidence of record and provided a well-reasoned analysis in support of her credibility finding. In disputing this assessment, Plaintiff requests the Court to reweigh the evidence, retry the issues, and substitute its own judgment for that of the ALJ, which it is not permitted to do. *Greenspan*, 38 F.3d at 236. The Court finds that substantial evidence

supports the ALJ's credibility assessment.[2]

**E.      New Evidence**

Plaintiff finally argues that the Appeals Council's failure to properly consider the new and material evidence prejudiced his claim. (Pl. Br. at 18-20.)

If a claimant submits new and material evidence which relates to the period before the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R. § 404.970(b). Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering that final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Higginbotham v. Barnhart*, 163 F. App'x. 279, 281-82 (5th Cir. 2006).

Here, the new evidence provided to the Appeals Council consisted of a medical report from March 2009, in which Plaintiff complained that he had been experiencing pain in his hips and low back since his right hip surgery, but he did not visit Dr. Kitziger after October 2008 because he did not have insurance coverage. The report noted, however, that Plaintiff had only a mildly antalgic gait, intact sensation and normal motor strength, and needed physical therapy for strengthening. The new evidence also consisted of a June 2009 medical report in which Plaintiff complained of hip pain after he fell from a chair. The report noted, however, that Plaintiff had normal flexion and extension of the left hip, and that his pain was controlled by Tylenol. X-ray results showed that the left hip

---

[2] Since substantial evidence supports the ALJ's credibility finding, the Court need not consider Plaintiff's argument that the ALJ's failure to develop the record contributed to his unsupported credibility finding.

was grossly stable in appearance with no acute fractures and that the right hip had no post-surgery complications. This evidence does not undermine or dilute the evidence that the ALJ relied on, and is not inconsistent with her finding that Plaintiff maintained the RFC for sedentary jobs that existed in significant numbers in the economy. *See Okolie v. Astrue*, 2008 WL 1947103, at *4 (N.D. Tex. May 2, 2008) (applying similar reasoning to reach a similar conclusion).

The remaining piece of evidence was a medical report from February of 2010, which assessed Plaintiff as having chronic pain in his neck and low back. However, the report did not relate to the time period for which benefits were denied because Plaintiff did not make any allegations of neck and back pain to his physicians between March 27, 2007, the alleged onset date, and October 2009, the date of the ALJ's decision. Even though he alleged at the hearing that he suffered from back pain, the new report does not show that the back pain was disabling at the time of the hearing. A remand is justified only if the new evidence does not concern a later-acquired disability or the subsequent deterioration of a previously non-disabling condition. *Bradley v. Bowen*, 809 F.2d 1054 (5th Cir. 1987). Since Plaintiff has not shown that the new evidence does not concern a later acquired disability or the subsequent deterioration of a previously non-disabling condition, remand is not required based on the new evidence. *See Percle v. Apfel*, 1999 WL 1124787, at *6 (E.D. La. Dec. 7, 1999).

In conclusion, the new evidence does not dilute the record to such an extent that the ALJ's decision becomes insufficiently supported. Therefore, remand is not required on this issue.

### III.  CONCLUSION

Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED**, and the decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED,** on this 17th day of December, 2010.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE